UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CATHERINE B. GIBBONS, as Executrix of the Estate of Margaret D. Strong and Individually, | § § § | CIVIL ACTION NO. |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BRISTOL-MYERS SQUIBB CO. and PFIZER, INC., | § § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Comes now Catherine B. Gibbons, as Executrix of the Estate of Margaret D. Strong and Individually (hereinafter "Plaintiff"), complaining of Defendants Bristol-Myers Squibb Co. and Pfizer, Inc. (hereinafter "Defendants"), and files this her Original Complaint and would respectfully show the Court as follows:

## SUMMARY OF THE CASE

1.      This action is brought by Plaintiff Catherine B. Gibbons, in an individual capacity, as well as acting as Executrix of the estate of Margaret D. Strong, Deceased.  Decedent was prescribed Eliquis, also known as apixaban, because of a diagnosis of atrial fibrillation.

2.      Defendants,   BRISTOL-MYERS SQUIBB and PFIZER, INC., (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Eliquis, as well as dealt with governmental  regulatory bodies.

3.      In written information about the safety and risks of Eliquis, Defendants negligently and fraudulently represented to the medical and healthcare community, including Decedent's prescribing doctor, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Decedent and the public in general, that Eliquis had been tested and was found to be safe and effective for its indicated uses.

4.      Defendants concealed their knowledge of Eliquis' defects from Decedent, the FDA, the public in general, and the medical community, including Decedent's prescribing physicians.

5.      These representations were made by Defendants with the intent of defrauding and deceiving Decedent, the public in general, and the medical and healthcare community including Decedent's prescribing doctor, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and purchase Eliquis, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Decedent herein.  Plaintiffs and the prescribing physicians were not aware of the falsity of these representations.

6.      After being on Eliquis for a short period of time, Plaintiff experienced a severe hemorrhagic event and ultimately died as a direct result of these injuries.

## **PLAINTIFF**

7.      Plaintiff, Catherine B. Gibbons was the daughter of Decedent and has been duly appointed as Independent Executor of the Estate by virtue of a Letters of Administration by the Probate Court of Smith County, Texas.

8.      Decedent's estate is being administered under the laws of Texas.

9.     Upon information and belief, Decedent was prescribed Eliquis from May 18, 2015 through June 4, 2015 by her physician for the treatment of atrial fibrillation.

10.     As a direct and proximate result of the use of Defendants' Eliquis, Decedent experienced severe bleeding from her nose and mouth on or about June 4, 2015 and as a direct result of the Eliquis, sustained a life-threatening, irreversible bleed from the use of Eliquis, as well as severe pain and suffering, all of which culminated in her death on that same day.

11.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred damages, including medical expenses; funeral expenses; probate, attorney, account, and other fees and cost of administration; and other economic and non-economic damages (including pain, suffering, and loss of love and affection) flowing from the death of the Decedent.

## DEFENDANTS

12.     Upon information and belief, Defendant Bristol-Myers Squibb ("BMS") company organized under the laws of Delaware, with a principal place of business at 5 Research Parkway, Wallingford, Connecticut.

13.     Defendant BMS is the holder of the approved New Drug Application ("NDA") for Eliquis as well as the supplemental NDA.  BMS was served and made an appearance herein.

14.     As part of its business, BMS was and is involved in the research, development, sales, and marketing of pharmaceutical products including Eliquis.

15.     At all relevant times, Defendant BMS was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Eliquis for use as an  oral anticoagulant.

16.     Defendant PFIZER, INC. ("Pfizer") is, and at all relevant times was, a corporation organized under the laws of the State of Delaware with a principal research and development facility at Eastern Point Road, Groton, CT 06340.  Pfizer was served and made an appearance herein.

17.     Defendant PFIZER was and is in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Eliquis for use as an oral anticoagulant.

18.     In 2007, Defendants entered into a worldwide collaboration to "commercialize" apixaban (Eliquis), which they have promoted as combining BMS's "long-standing strengths in cardiovascular drug development and commercialization" with Pfizer's "global scale and expertise in this field."

## JURISDICTION AND VENUE

19.     Jurisdiction is proper in federal court pursuant to 28 USC §1332 for the reason that there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy greatly exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

## FACTUAL ALLEGATIONS

20.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Eliquis as an oral anticoagulant, also known as a Factor Xa inhibitor.

21.     Defendants received FDA approval to market Eliquis in 2012 (NDA 202155).

22.     Among the uses for which Defendants obtained permission to market Eliquis was in the treatment of atrial fibrillation.  Approval of Eliquis was based in large part on clinical trials known as ARISTOTLE.

23.     The ARISTOTLE study was conducted under the supervision and control of Defendants in various countries including China.

24.     Based upon information and belief, Defendants, as means of cutting costs, chose incompetent and untrustworthy agents in China to conduct the ARISTOTLE study.  Sadly, Defendants and their agents committed fraud in their conduct of  the ARISTOTLE study, by *inter alia,* concealing side effects that occurred in test users of Eliquis; concealing a death which went unreported (whereas one purpose of the study was to study the rate of death in Eliquis users compared to others on Coumadin); concealing loss of subjects to follow up; concealing major dispensing errors including indicating that certain subjects were getting Eliquis when they were not; having poor overall  quality control; and changing and falsifying records, including records disappearing just before the FDA made a site visit, reportedly on the order of an employee of BMS (who was later terminated).

25.     At a Feb. 9, 2012 meeting between the FDA and BMS-Pfizer executives, the FDA is reported to have characterized the conduct of Defendants as showing a pattern of inadequate supervision.

26.     Defendants market Eliquis as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

27.     Defendants emphasize the alleged benefits of treatment with Eliquis over warfarin, in that Eliquis does not require periodic monitoring with blood tests, Eliquis did not limit a patient's diet, and Eliquis has a set dose that fits all patients

28.     When the application by Defendants to the FDA was pending, in 2012, Dr. Thomas Marcinak, a physician in the FDA who reviewed the data submitted by Defendants in order to obtain approval to market Eliquis, objected to missing data from the ARISTOTLE study and recommended that the labeling that Defendants were going to use with the drug should discuss the quality control problems in ARISTOTLE.

29.     Defendants then stated publicly that they were submitting "additional data" to the FDA, and to this date have never publicly acknowledged the missing and incorrect data submitted to the FDA, which would be of concern to prescribing physicians and the public.

30.     After employees of Defendants wrote and submitted an article based on the ARISTOTLE study for the New England Journal of Medicine, the article was reportedly attacked for its accuracy and omissions by the former editor-in-chief of that journal, Arnold Relman, M.D., including the failure to show that Eliquis was any more efficacious than low-cost warfarin.

31.     Critically, there is no antidote/reversal agent to Eliquis available on the market, unlike Coumadin. Therefore, in the event of hemorrhagic complications, there is no available or validated reversal agent or antidote, as there is for Coumadin.

32.     The U.S. label approved when Eliquis was first marketed in the U.S. and at the time Decedent was using it did not contain an adequate warning regarding the lack of antidote/reversal agent that appropriately described the significance of that lack of reversal agent for patients taking Eliquis who began to bleed.

33.     After the drug was approved by the FDA, Defendants engaged in an aggressive marketing campaign for Eliquis, including extensive marketing directly to the public, via TV and print.  The chief promotional aspect of the sales pitch was that, unlike with Coumadin, the blood levels of the patient did not need to be monitored.

34.     In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Eliquis with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Eliquis, and that such irreversibility would have life-threatening and fatal consequences.

35.     Prior to Decedent's use of Eliquis, Decedent became aware of the existence of Eliquis and its general claims, based upon her prescribing physician's recommendation of the use of this medication.

36.     Based upon information and belief, prior to Decedent's use of Eliquis, Decedent's prescribing physician would have received promotional materials and information from sales representatives of Defendants that Eliquis was just as effective as warfarin (Coumadin) in reducing strokes in patients with non-valvular atrial fibrillation, and was more convenient, without also adequately informing prescribing physicians of the significance of the lack of a reversal agent or antidote that could stop or control bleeding in patients taking Eliquis.

37.     At all times relevant hereto, Defendants also failed adequately to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Eliquis, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Eliquis.

38.      Before and after marketing Eliquis, Defendants became aware of many reports of serious hemorrhagic events in users of its drugs, both as reported to the FDA and to them directly. Yet Defendants have not fully disclosed the complete facts, findings, and complications/adverse events of the ARISTOTLE study.

39.      Despite the clear signal generated by the side effect data, Defendants failed to either alert the public and the scientific community or perform further investigation into the safety of Eliquis.

40.      Defendants' product labeling and prescribing information for Eliquis:

(a)      failed to investigate, research, study, and define, fully and adequately, the safety profile of Eliquis;

(b)      failed to provide adequate warnings about the true safety risks associated with the use of Eliquis;

(c)      failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Eliquis and its complete effects on the degree of anticoagulation in patients of various populations;

(d)      failed to provide adequate warning that it is difficult or impossible to assess the degree and extent of anticoagulation in patients taking Eliquis;

(e)      failed to disclose in the "Warnings" section the significance of the fact that there is no drug, agent, or means to reverse the anticoagulation effects of Eliquis during an expanded timetable;

(f)      failed to provide adequate instructions on how to intervene and stabilize a patient who suffers a bleed while taking Eliquis;

(g)      failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Eliquis users;

(h)      failed to provide adequate warnings regarding the increased risk of suffering a bleeding event;

(i)      failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Eliquis and to continue testing and monitoring of renal functioning periodically while the patient is on Eliquis;

    (j)      failed to include a "BOXED WARNING" about serious bleeding events associated with Eliquis;

    (k)      in their "Medication Guide" intended for distribution to patients to whom Eliquis has been prescribed, Defendants failed to disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Eliquis and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening, or fatal consequences.

41.     Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Eliquis was associated with or could cause life-threatening bleeding in specific patient populations, and failed to fully identify and convey the risks of use of Eliquis at the same time as other blood-thinning agents, such as Aspirin.

42.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Eliquis for life-threatening bleeding risk further rendered warnings for this medication inadequate.

43.     Margaret D. Strong began taking Eliquis on or about May 18, 2015, because of her history of atrial fibrillation.

44.     Ms. Strong was in a skilled nursing facility rehabilitating from a bout with pneumonia and atrial fibrillation. On June 4, 2015, she was found in her bed bleeding from her mouth and nose. In addition, there were copious amounts of blood in a nearby trash can. She was also in cardiac arrest and CPR was started. She was taken by ambulance to the hospital where she was found to have suffered severe irreversible brain damage that was caused by the cardiac arrest. Plaintiff's family removed her from life support and she died that same day.

45.     By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer emotional and mental anguish, medical and funeral expenses, and other economic and non-economic damages stemming from the death of the Decedent, as a result of the actions and inactions of the Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### (STRICT LIABILITY IN TORT – DESIGN DEFECT AND FAILURE TO WARN)

46.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff pleads this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's resident State.

47.     Defendants had a products liability duty under Texas law to design, manufacture, and market products, including Eliquis, that were not unreasonably dangerous or defective, but which were safe for their users, including Decedent.  Defendants also had a products liability duty under Texas law to provide adequate warnings and instruction for use regarding Eliquis.  At the time of Plaintiff's injuries, Defendants' pharmaceutical drug Eliquis was defective and unreasonably dangerous to foreseeable consumers, including Plaintiff.

48.     At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Eliquis as hereinabove described that was used by the Plaintiff.

49.     Defendants' Eliquis was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product, including Decedent, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

50.     At those times, Eliquis was in an unsafe, defective, and inherently dangerous condition, which was unreasonably dangerous to users for its intended or reasonably foreseeable use, and in particular, the Plaintiff herein.

## A.  Design Defect

51.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

52.    Eliquis was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

53.    When it left the control of Defendants, Eliquis was expected to, and did reach Decedent without substantial change from the condition in which it left Defendants' control.

54.    Eliquis was defective when it left Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or applicable federal requirements, and posed a risk of serious injury and death. There were conditions of Eliquis that rendered it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.

55.    Specifically, Eliquis was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening more so than other anticoagulants as to patients in certain patient populations, including those with renal compromise, of a certain age and of certain weight.  Additionally, Eliquis was designed with no reversal agent, so that in the event of a hemorrhagic bleed, there would be no method to reverse the bleeding, thus causing a potentially fatal bleeding episode.

56.    Decedent used Eliquis in substantially the same condition it was in when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

57.     Decedent and her healthcare providers did not misuse or materially alter their Eliquis.

58.     As a direct and proximate result of the use of Eliquis, Ms. Strong suffered serious physical injury (and death), harm, damages and economic loss, and Plaintiff will continue to suffer such harm, damages and economic loss in the future.

59.     Defendants placed Eliquis into the stream of commerce with wanton and reckless disregard for public safety.

60.     Eliquis was in an unsafe, defective, and inherently dangerous condition. Eliquis contains defects in its design which render the drug dangerous to consumers, such as Decedent, when used as intended or as reasonably foreseeable to Defendants. The design defects render Eliquis more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

61.     Eliquis was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Eliquis was defective and unsafe, even when used as instructed.

62.     The nature and magnitude of the risk of harm associated with the design of Eliquis, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Eliquis.

63.     The risks of harm associated with the design of Eliquis are higher than necessary.

64.     It is highly unlikely that Eliquis users would be aware of the risks associated with Eliquis through either warnings, general knowledge or otherwise, and Decedent specifically was not aware of these risks, nor would Decedent have expected them.

65.     The design did not conform to any applicable public or private product standard that was in effect when Eliquis left the Defendants' control.

66.     Eliquis's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner.  It was more dangerous than Decedent expected.

67.     The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Eliquis as to certain users/patient populations, including but not limited to the following:

a.     a dangerous one-size fits almost all approach to doing instructions.  For any separation of patient populations, it was grossly inaccurate and not representative of the true bleeding risks and dosage needs for these populations;

b.     Failure to have tests available to determine and demonstrate therapeutic range;

c.     Failure to advise testing for therapeutic range;

d.     Failure to provide a therapeutic range; and

e.     Failure to recommend testing and/or monitoring by providers for therapeutic range.

68.     At all times herein mentioned, Eliquis was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.  Improper dosing instructions resulted in patients like Ms. Strong becoming hyper-coagulated (excessive coagulation) causing serious bleeding leading to hemorrhage and death.

69.    Defendants knew, or should have known that at all times herein mentioned, their Eliquis was in a defective condition, and was and is inherently dangerous and unsafe.

70.    At the time of Decedent's use of Eliquis, Eliquis was being used for the purposes and in a manner normally intended, and specifically for atrial fibrillation patients as an alternative to Warfarin.

71.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Decedent in particular; and Defendants are therefore strictly liable for the injuries sustained by the Decedent. The improper dosing led to patients like Ms. Strong becoming hyper-coagulated (excessive coagulation), causing serious bleeding and led to hemorrhage and death.

72.    Decedent could not, by the exercise of reasonable care, have discovered Eliquis' defects herein mentioned and perceived its danger.

73.    There was a safer alternative design for Eliquis available at the time of manufacture. This safer alternative design would have prevented or significantly reduced the risk of the injury and death in question without substantially impairing the product's utility and the safer alternative design was economically and technologically feasible at the time Eliquis left control of Defendants, by the application of existing or reasonably achievable scientific knowledge. A safer alternative design of Eliquis would have included, *inter alia,* a proper therapeutic range of dosing, a recommended regime of monitoring/testing, availability of an effective reversal agent, and proper instructions on the half-life of Eliquis and how long it must be discontinued before surgery.

74.     Defendants' conduct was extreme and outrageous.  Defendants risked the lives of consumers and users of their products, including Decedent, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.  Defendants knew marketing the drug without knowing the safe therapeutic level for all consumers would likely cause injury.  To this end, Defendants published a paper showing 43 percent more exposure to the drug for those with creatinine levels at 1.5 or above, yet failed to properly supply adjusted dosing information.  Thus, Defendants knowingly put a group of consumers at risk, while Defendants knew that placing this drug on the market with dosing instructions not properly adjusted for age and co-morbidities of certain consumers would likely cause injury.   Defendants further knew or should have known that three (3) days was not an adequate amount of time to discontinue Eliquis prior to major surgery.

75.     The unreasonably dangerous nature of Eliquis caused serious harm, and ultimately death, to Ms. Strong.

76.     These aforementioned design defects in Defendants' drug Eliquis were a proximate cause of Plaintiff's injuries.  As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries (in this case death) as well as physical pain and mental anguish, and diminished enjoyment of life, and financial expenses for hospitalization and medical care all suffered or incurred before the patient's death.

**B. Failure To Warn**

77.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.  Defendants are strictly liable for Plaintiff's injuries in the following ways in which they failed to adequately warn of the known dangers of Eliquis:

   a.     Defendants failed to warn and place adequate warnings and instructions on Eliquis;

   b.     Defendants failed to adequately give ***correct*** dosing instructions for different ages, renal impairments and weights, and instead gave inadequate dosing instructions for those populations;

   c.     Defendants failed to provide proper information as to the half-life of Eliquis and the amount of time that Eliquis should be discontinued prior to surgery;

   d.     Defendants failed to provide proper warnings that the lack of a reversal agent can cause death; and

   e.     Defendants failed to warn of the fraud and irregularities which occurred during the testing of Eliquis during the ARISTOTLE drug trials, and how such irregularities makes Defendants' data and claims unreliable.

78.     By reason of the foregoing, Defendants have become strictly liable in tort to the Plaintiff for the marketing, promoting, distribution, and selling of a defective product, Eliquis, which Defendants placed on the market without adequate warnings.  Defendants breached their duties by failing to provide a reasonably safe pharmaceutical and adequately warn of same.  By virtue of the foregoing, Defendants are jointly and severally liable for Plaintiff's injuries.

79.     Defendants' inadequate warnings of Eliquis were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

80. These aforementioned warning defects in Defendants' drug Eliquis were a proximate cause of Plaintiff's injuries.

81. As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries (in this case death) as well as physical pain and mental anguish, and diminished enjoyment of life, and financial expenses for hospitalization and medical care all suffered or incurred before the patient's death.

82. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Decedent, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public regarding the true risks of bleeding in different population. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**COUNT II and COUNT III**
**(NEGLIGENCE AND GROSS NEGLIGENCE)**

83. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

84. Defendants had a duty to exercise reasonable care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Eliquis including a duty to assure that the product did not cause unreasonable, dangerous side-effects to users.

Plaintiffs' Original Complaint – Page 17

85.     Defendants failed to exercise ordinary care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Eliquis in that Defendants knew, or should have known, that the drugs created a high risk of unreasonable, dangerous side-effects and harm, including life-threatening bleeding, as well as other severe and personal injuries (including in this case death) and prior to her death, Ms. Strong suffered physical pain and mental anguish, and diminished enjoyment of life. Further, Defendants were well aware that if dosing instructions were not properly adjusted for age and co-morbidities, this would likely cause injury, yet failed to appropriately adjust the dosing information.   Defendants' failure to provide a reasonably safe pharmaceutical, and Defendants' failure to adequately instruct or warn the users of the aforementioned dangers was negligent.  Plaintiff's injuries and damages were a foreseeable, direct and proximate result of the negligence of Defendants.

86.     Defendants, their agents, servants, and/or employees were negligent in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Eliquis in that, among other things, they:

    a.    Failed to use due care in designing and manufacturing, and testing Eliquis (before placing it on the market) so as to avoid the aforementioned risks to individuals;

    b.    Failed to analyze pre-marketing test data of Eliquis and convey the true risks of Eliquis based on the results of the testing conducted prior to placing Eliquis on the market;

    c.    Failed to conduct sufficient post-marketing and surveillance of Eliquis in order to provide updated information to providers and patient populations;

    d.    Failed to accompany the drug with proper warnings regarding all possible adverse side effects associated with its use, and the comparative severity and duration of such adverse effects, as well as the significance of the lack of a reversal agent for Eliquis. The warnings given did not accurately reflect the symptoms, scope or severity of the side effects;  the warnings

given did not warn Plaintiff and her healthcare providers regarding the need for blood monitoring, appropriate dose adjustments for various consumer groups, and further failed to fully and appropriately warn of the risk of serious bleeding that may be irreversible, and life-threatening, associated with Eliquis;

e.     Failed to provide adequate training and instruction to medical care providers for the appropriate use of Eliquis;

f.     Falsely and misleadingly overpromoted, advertised and marketed Eliquis as set forth herein including overstating efficacy, minimizing risk to influence patients, such as Plaintiff, to purchase and consume such product;

g.     Manufacturing, producing, promoting, formulating, creating, and/or designing Eliquis without thoroughly testing it;

h.     Manufacturing, producing, promoting, formulating, creating, and/or designing Eliquis without adequately testing it;

i.     Not conducting sufficient testing programs to determine whether or not Eliquis was safe for use; in that Defendants herein knew or should have known that Eliquis was unsafe and unfit for use by reason of the dangers to its users;

j.     Selling Eliquis without making proper and sufficient tests to determine the dangers to its users;

k.     Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Eliquis;

l.     Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Eliquis;

m.     Failing to adequately, sufficiently and properly test Eliquis;

n.     Negligently advertising and recommending the use of Eliquis without sufficient knowledge as to its dangerous propensities;

o.     Negligently representing that Eliquis was safe for use for its intended purpose, when, in fact, it was unsafe;

p.     Negligently representing that Eliquis had equivalent safety and efficacy as other forms of treatment for patients taking blood-thinning medication;

q.    Negligently designing Eliquis in a manner which was dangerous to its users;

r.    Negligently manufacturing Eliquis in a manner which was dangerous to its users;

s.    Negligently producing Eliquis in a manner which was dangerous to its users;

t.    Concealing information from Decedent showing that Eliquis was unsafe, dangerous, and/or non-conforming with FDA regulations;

u.    Improperly concealing and/or misrepresenting information from the Plaintiff, healthcare professionals (including Ms. Strong's prescribing physicians), and/or the FDA, concerning the severity of risks and dangers of Eliquis compared to other forms of treatment for blood-thinning; and,

v.    Placing an unsafe product into the stream of commerce.

87.    Defendants under-reported, underestimated and downplayed the serious dangers of Eliquis.

88.    Defendants negligently compared the safety risk and/or dangers of Eliquis with other forms of treatment of blood thinners.

89.    Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Eliquis in that they:

a.    Failed to use due care in designing and manufacturing Eliquis so as to avoid the aforementioned risks to individuals;

b.    Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Eliquis;

c.    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Eliquis;

    d.      Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Eliquis;

    e.      Failed to warn Decedent and/or her physician of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

    f.      Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Eliquis;

    g.      Failed to warn Decedent and/or her physician, prior to actively encouraging the sale of Eliquis, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual or of the risks of hemorrhagic events to ensure early discovery of potentially serious side effects;

    h.      Failed to provide full and appropriate dosing guidelines for all consumer groups;

    i.      Failed to warn that the lack of a reversal agent was likely to cause injury or death

    j.      Were otherwise careless and/or negligent.

90.     Despite the fact that Defendants knew or should have known that Eliquis caused unreasonable, dangerous side-effects which many users would be unable to remedy by any means, Defendants continued to market Eliquis to consumers, including the medical community and Decedent.

91.     Defendants knew or should have known that consumers such as Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

92.     It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Decedent.

93.     As a direct and proximate result of Defendants' negligence, Margaret D. Strong suffered serious physical injury, harm (and in this case death), and Plaintiff will continue to

suffer damages and economic loss in the future. Defendants are jointly and severally liable in negligence for Plaintiff's injuries and for general and special damages proximately caused by such negligence, in such amounts as shall be determined at trial.

94.      Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Decedent, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting consuming public. Defendants' outrageous conduct constitutes gross negligence which warrants an award of punitive damages.

## COUNT IV
## (FRAUD/FRAUDULENT CONCEALMENT)

95.      Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

96.      Prior to Decedent's use of Eliquis and during the period in which Decedent actually used Eliquis, Defendants fraudulently suppressed material information regarding the safety and efficacy of Eliquis.

97.      Defendants falsely and fraudulently represented to the medical and healthcare community, and to Decedent, the FDA, and the public in general, that said product, Eliquis, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients required to take blood-thinning medications. Further, Defendants represented that the product had been adequately tested and evaluated in the ARISTOTLE study, and that the product was safe even though there was no reversal agent for the medication. Specifically, the fraudulent statements include, but are not limited to, the following:

a.      Website – www.eliquis.com - https://www.eliquis.com/eliquis/hcp/stroke-risk-reduction-nvaf/efficacy - Defendants published "For patients with Nonvalvular Atrial Fibrillation (NVAF), Eliquis was proven effective in 2 Phase III studies."    Defendants then cited to the "ARISTOTLE Study Primary Efficacy Endpoint" for justification of this representation as well as for its representation of its "superiority to warfarin."    Defendants intentionally misled consumers and prescribers by citing to this highly flawed ARISTOTLE study.    Specifically, in the ARISTOTLE study sponsored by Defendants, there were unreported or late-reported serious side effects, and then one of Defendant's site managers instructed individuals to alter and otherwise falsify records.    Additionally, per the FDA, [Defendant] BMS employees knew of these "irregularities" and then withheld this data from the global BMS team.  Additionally, during the allegedly double-blind study, 7.3% of apixaban versus just 1.2% of the warfarin group were alleged to have received incorrect medications or placebos.  All of this data was fraudulently submitted to the FDA, and then Defendants used this fraudulent data to misrepresent the effectiveness of Eliquis when citing to the ARISTOTLE study in support of its claims of the medication's efficacy.

b.      Website – www.eliquis.com - https://www.eliquis.com/eliquis/hcp/stroke-risk-reduction-nvaf  - Defendants published that "ELIQUIS Is the *ONLY* anticoagulant that demonstrated superiority in *BOTH* stroke/systemic embolism and major bleeding vs warfarin . . . ARISTOTLE was a Phase III, randomized, multinational, double-blind trial of 18,201 nonvalvular atrial fibrillation patients (ELIQUIS, n=9,120; warfarin, n=9,081) with 1 or more additional risk factors for stroke.  Defendants then cited to the ARISTOTLE Study for justification of this representation as well as for its representation of its "superiority to warfarin."  Defendants intentionally misled consumers and prescribers by citing to this highly flawed ARISTOTLE study.  Specifically, in the ARISTOTLE study sponsored by Defendants, there were unreported or late-reported serious side effects, and then one of Defendant's site managers instructed individuals to alter and otherwise falsify records.    Additionally, per the FDA, [Defendant] BMS employees knew of these "irregularities" and then withheld this data from the global BMS team.  Additionally, during the allegedly double-blind study, 7.3% of apixaban versus just 1.2% of the warfarin group were alleged to have received incorrect medications or placebos.    All of this data was fraudulently submitted to the FDA, and then Defendants used this fraudulent data to misrepresent the effectiveness of Eliquis when citing to the ARISTOTLE study in support of its claims of the medication's efficacy.

c.      Website – www.eliquis.com – as archived on September 2, 2013 – Defendants published that "Eliquis had less major bleeding than warfarin" and also cited that "unlike warfarin," there is no routine monitoring

required.    As part of the support for these representations, Defendants then cited to the ARISTOTLE Study for justification of this representation as well as for its representation of its "superiority to warfarin." Defendants intentionally misled consumers and prescribers by citing to this highly flawed ARISTOTLE study.  Specifically, in the ARISTOTLE study sponsored by Defendants, there were unreported or late-reported serious side effects, and then one of Defendants' site managers instructed individuals to alter and otherwise falsify records.   Additionally, per the FDA, [Defendant] BMS employees knew of these "irregularities" and then withheld this data from the global BMS team.  Additionally, during the allegedly double-blind study, 7.3% of apixaban versus just 1.2% of the warfarin group were alleged to have received incorrect medications or placebos.   All of this data was fraudulently submitted to the FDA, and then Defendants used this fraudulent data to misrepresent the effectiveness of Eliquis when citing to the ARISTOTLE study in support of its claims of the medication's efficacy.

d.    Dosing Guidelines – March 2014, as published by Defendants:

    i.    Page 3 – "No dose adjustment required in patients with mild, moderate, or severe renal impairment alone" – Defendants intentionally misled prescribing physicians and consumers to believe that even with moderate or severe renal impairment, Eliquis was safe, when in fact, it was not appropriate for such patients;

    ii.    Page 4 – "Does not require routine monitoring using international normalized ration (INR) or other tests of coagulation" – Defendants intentionally misled prescribing physicians and consumers to believe that no routine monitoring is necessary.  However, given the extreme bleeding risk in patient populations (some of which were not adequately studied), monitoring is required for some or all patient populations;

    iii.    Page 4 – While there is a section regarding the fact that "there is no established way to reverse the anticoagulant effect of apixaban, which can be expected to persist for at least 24 hours after the last dose," Defendants wrongfully withheld the fact that without such a reversal agent, apixaban can be deadly;

e.    December 2012 – package insert for Eliquis, as published by Defendants –

    i.    Section 2.2 – recommended dosage is false, as the patient characteristics were inappropriate and should have been limited to one characteristic, instead of two of the listed characteristics;

      ii.    Section 5.2 – Bleeding.  While there is a statement made that there is no reversal agent, Defendants withheld information and data that without the reversal agent, death could result;

   f.    March 2014 – package insert for Eliquis, as published by Defendants –

      i.    Section 2.2 – recommended dosage is false, as the patient characteristics were inappropriate and should have been limited to one characteristic, instead of two of the listed characteristics; and

      ii.    Section 5.2 – Bleeding.  While there is a statement made that there is no reversal agent, Defendants withheld information and data that without the reversal agent, death could result.

98.    These representations were made by said Defendants with the intent of defrauding and deceiving Decedent, the public in general, and the medical and healthcare community in particular (including Ms. Strong's prescribing physicians), and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Eliquis, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff herein.

99.    At the time the aforesaid representations were made by the Defendants and, at the time Decedent used Eliquis, Decedent and her prescribing physicians were unaware of the falsity of said representations and reasonably believed them to be true.

100.    In reliance upon said representations, Decedent was induced to and did use Eliquis, thereby sustaining severe and permanent personal injuries.  Further, Decedent's prescribing physicians also acted in reliance upon said misrepresentations.

101.    Defendants knew and were aware, or should have been aware, that Eliquis had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.  Moreover, Defendants knew or should have known that the recommended

patient populations for dosing adjustments of Eliquis were inappropriate, and the failure to provide information that death can result from the lack of a reversal agent or the failure to monitor specific blood tests while on this medication is incomprehensible.

102.    Defendants knew or should have known that Eliquis had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

103.    Defendants brought Eliquis to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiff.

104.    At the time Defendants concealed the fact that Eliquis was not safe, Defendants were under a duty to communicate this information to Decedent, physicians, the FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Eliquis.

105.    Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

106.    Decedent and her prescribing physicians relied upon the Defendants' outrageous untruths regarding the safety of Eliquis.

107.    Decedent's prescribing physicians were not provided with the necessary information by the Defendants, to provide an adequate warning to Decedent.

108.    Eliquis was improperly marketed to Decedent and Decedent's prescribing physicians as the Defendants did not provide proper instructions about how to use the medication (including, but not limited to, failing to properly adjust dose requirements for all consumers and

for failing to state that the lack of a reversal agent was likely to cause serious injury or death) and thus did not adequately warn about Eliquis's risks.

109.    As a direct and proximate result of Defendants' malicious and intentional concealment of material life-altering information from Decedent and Decedent's prescribing physicians, Defendants caused or contributed to Plaintiff's injuries (and ultimate death).

110.    It is unconscionable and outrageous that Defendants would risk the lives of consumers, including Decedent.  Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public about the dangers associated with the use of Eliquis. Defendants' outrageous conduct rises to the level necessary that Plaintiff should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

111.    Defendants had a duty to disclose material information about serious side-effects to consumers such as Decedent.

112.    Additionally, by virtue of Defendants' partial disclosures about the medication, in which Defendants touted Eliquis as a safe and effective medication, Defendants had a duty to disclose all facts about the risks associated with use of the medication, including the risks described in this Complaint.  Defendants intentionally failed to disclose this information for the purpose of inducing consumers, such as Decedent, to purchase Defendants' dangerous product.

113.    Had Decedent been aware of the hazards associated with Eliquis, Decedent would have employed appropriate blood monitoring, consumed a different anticoagulant with a better safety profile, or not have consumed the product that led proximately to Decedent's injuries (and ultimate death).

114.     Upon information and belief, Plaintiff avers that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with Eliquis, for the purpose of preventing consumers, such as Decedent, from discovering these hazards.

## COUNT V
## (BREACH OF WARRANTIES)

115.     Defendants designed, tested, manufactured, sold, distributed, marketed and promoted that Eliquis was were safe and efficacious for its intended uses.  The Eliquis consumed by Decedent reached him without substantial change in its condition, and was used by Decedent as intended by Defendants.  Defendants expressly and impliedly warranted that Eliquis was not unreasonably dangerous and instead were merchantable and fit for its intended use by Decedent.  Further, Defendants expressly and impliedly warranted that Eliquis had been fully and adequately tested for long-term use and was, *inter alia,* safe to use in the treatment of atrial fibrillation.

116.     Defendants breached these warranties (both express and implied) as Eliquis was not merchantable, was unfit for its intended use, and was unreasonably dangerous when comparing the benefits Eliquis to the risks associated with its use.  As a direct and proximate result of these breaches of warranties, Plaintiff was injured.

## **DAMAGES**

## **Wrongful Death**

117.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff pleads this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's resident State.

118.    Plaintiff brings this claim, where appropriate, for the benefit of the Decedent's lawful beneficiaries, including herself.

119.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Eliquis as outlined above, Plaintiff brings this claim on behalf of all wrongful death beneficiaries of Decedent for all economic and noneconomic losses under applicable state statutory and/or common laws.

## Survival Action

120.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff pleads this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's resident State.

121.    As a direct and proximate result of the conduct of Defendants, where appropriate, Decedent, prior to her death, was obligated to spend various sums of money to treat her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Decedent was caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of her death; and, as a direct and proximate result of the aforesaid, Decedent suffered tremendously. Plaintiff brings this claim on behalf of Decedent's estate under applicable state statutory and/or common laws.

122.    As a direct and proximate result of the conduct of Defendants, Plaintiff Decedent and her heirs, until the time of Decedent's death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

## JURY TRIAL DEMANDED

123.    Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages available by law or statute in an amount to be determined at trial of this action;

2. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages paid or owed by Plaintiff in an amount to be determined at trial of this action;

3. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants, which constitute gross negligent, as Defendants demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4. Prejudgment interest;

5. Post-judgment interest;

6. Awarding Plaintiff the costs of these proceedings; and

Such other and further relief as this Court deems just and proper.

Dated:  April 6, 2017

Respectfully submitted,

*/s/Les Weisbrod*
Les Weisbrod
Texas Bar No. 21104900
**MILLER WEISBROD LLP**
11551 Forest Central Drive, Suite 300
Dallas, TX 75243
(214) 987-0005 – telephone
(214) 987-2545 – facsimile
lweisbrod@millerweisbrod.com

**COUNSEL FOR PLAINTIFF**